## Marvin, Coroner, Appellant, *v.* Monroe County.

Argued October 27, 1943. Before KELLER, P. J.,

Baldrige, Stadtfeld, Rhodes, Hirt and Kenworthey, JJ. (Reno, J. absent).

*Kennard Lewis*, for appellant.

*George T. Robinson*, County Solicitor, for appellee.

*A. W. Richter*, for National Association of Coroners, Amici Curiae.

Opinion by Baldrige, J., January 27, 1944:

Francis M. Marvin, coroner of Monroe County, brought this action of assumpsit against the county to recover fees totalling $72.70, for services rendered in making preliminary investigations of the deaths of ten individuals in Monroe County during the year 1942. The county commissioners refused payment of the fees on the ground that the coroner viewed the bodies without sufficient cause and that in none of the ten cases was it deemed necessary to hold an inquest. The court below sustained the county's affidavit of defense raising questions of law, holding that there was no necessity or reason for the coroner's viewing the dead bodies except in one instance, a suicide which the district attorney ordered him to investigate. The court entered judgment for the plaintiff in the amount of $8.10. The case came to this court on appeal.

Attached to the plaintiff's statement of claim was a full, detailed typewritten report of each of the ten deaths investigated and bodies viewed. The following is a typical example of each report: "At 7:10 A. M. o'clock, on Monday April 6, 1942, the undersigned Coroner received a telephone call from, Chief Arthur Swink of the East Stroudsburg Borough Police advising that a man had just been found dead from a gun shot wound, at his home located at No. 408 King St., that Boro, and known to the police to be the body of Charles Goff. Responding to said call, the undersigned Coroner arrived at the East Stroudsburg Borough Police headquarters and proceeded to accompany Chief Swink and officer Russell Walton to the home of the deceased at the location above designated and there found the body of Charles Goff, aged about 75 years, sitting in a chair and facing the front door of his home, with the whole upper portion of his head blown off by a gun shot blast and with a 16 gauge single barrel shot gun resting at his side. On inquiring I found that the body had first been discovered by Mrs. Mary Armitage, a neighbor and that death had in all probabilities occurred several hours previous to the finding. After examining the corpse and inquiring into all of the surrounding and accompanying circumstances, it is adjudged by me that the said Charles Goff had come to his death by shooting, at his own hand, otherwise termed a suicide and therefore an inquisition was deemed unnecessary and accordingly no inquest was held. (Sig.) Francis M. Marvin (Seal) Coroner."

Three additional deaths investigated resulted from self-inflicted gun shot or rifle wounds. Three persons died of sudden and acute heart attacks where there had been no medical attendance within a reasonable time prior to death. In one of these instances the body was found on a barn floor, in another a man was discovered in a dying condition on a public street, and in the third

case the deceased fell over while eating his mid-day meal in a diner. Two of the reports show that the persons died following unavoidable accidents. One was found with his clothes burned off in the midst of burning grass in a field. The other suffered a fractured skull when hit by an automobile while walking along a highway in an intoxicated condition. According to another report a man was found dead in bed. In every one of these ten cases the coroner was called on the telephone and informed by either the district attorney, state police, local police, or a practicing physician of a sudden or violent death.

The office of coroner was one of great dignity and is equal in antiquity with that of the sheriff. Blackstone in his Commentaries, Book, I, chapter 9, p. 348, states: "The office and power of a coroner are also, like those of the sheriff, either judicial or ministerial; but principally judicial. This is in great measure ascertained by statute 4 Edw. I, de officio coronatoris; and consists, first, in inquiring when any person is slain, or dies suddenly, or in prison, concerning the manner of his death." For an additional historical discussion of the jurisdiction and authority of a coroner see 18 C. J. S., Coroners, §15. The principal judicial function of the coroner in these modern times, as in the early days, is to investigate the causes of sudden, violent, and unnatural deaths, with a view of determining whether they were caused by criminal actions of others and to apprehend and bring the responsible persons to trial. In the discharge of these duties he is only called upon to use reasonably sound discretion. Of course, he cannot act capriciously or arbitrarily and his discretion is always subject to review. His acts in investigating deaths are, however, presumably in good faith and valid unless the contrary is shown: *County of Lancaster v. Mishler,* 100 Pa. 624, 626, 627; *Miller v. Cambria County,* 29 Pa. Superior Ct. 166. These cases were cited

by the appellee and were mainly relied upon by the learned court below as controlling.

The *Mishler* case involved a coroner's fee for holding an inquest. In the *Miller* case, as here, the suit was for fees covering preliminary investigations by the coroner where he decided no inquests were necessary. We there affirmed the court below in entering a judgment for the county as the coroner's evidence in specific cases did not appear, as here, and it was impossible, therefore, to determine in a given case whether or not he acted with cause and in good faith. This court stated, p. 168: "If the plaintiff's evidence had been directed to the specific cases for which his charges are made and it had appeared that as to any one of them there were suspicious circumstances moving him to action, his cause could have been maintained as to the particular case, but, as the record is presented, the judgment of the court below should be affirmed." The opinion thus clearly implies that if the death, as reported to, or observed by, the coroner, is such as to lead a reasonable person in his position to believe that felonious conduct caused the death a preliminary view and personal investigation by the coroner is proper.

After *County of Lancaster v. Mishler,* supra, and *Miller v. Cambria County,* supra, were decided the Act of March 30, 1897, P. L. 8, 16 PS §2833, was passed. Section 1 of that statute does not affect the substantive law as to the circumstances under which a coroner may act, but it is a legislative declaration that a coroner who views a dead body and decides no inquest is necessary "shall receive the same fee and mileage as is now allowed by law for such view when followed by an inquest."

The Act of March 28, 1814, P. L. 352, 6 Sm. L. 228, §19, as amended by the Act of April 7, 1927, P. L. 168, §1, 16 PS §2832, fixes the coroner's fees and mileage in

counties of the class here involved (seventh class) at $5.50 for viewing a dead body, etc.

The circumstances under which it is the duty of a coroner to make an investigation is stated in section 1 of the Act of April 16, 1907, P. L. 92: "It shall be the duty of the coroner and the deputy coroner of any county in this commonwealth, in all cases where the cause of death is of a *suspicious nature* and *character,* to cause an investigation of the facts concerning said death, and to make or cause to be made such an autopsy as the facts of the case may demand, by such official." (Italics supplied.)

That statute was re-enacted and amended by section 2 of the Act of July 12, 1935, P. L. 710, 16 PS §3161, as follows: "It shall be the duty of the coroner or the deputy coroner of any county in this Commonwealth, in all cases where death is *sudden or violent or is of a suspicious nature and character,* to cause a careful investigation of the facts concerning said death to be made, *to ascertain whether the death was due to other than natural causes,* and to make or cause to be made such an autopsy as the facts of the case may demand." (Italics supplied.) Section 2 provides for the disposition by the health authorities, etc. of the body where it appears that the death, though sudden or violent, is not surrounded by suspicious circumstances and contains the following significant proviso: "Provided, That the coroner shall have the right to view any such body, and to investigate the facts or causes of said death, if in his opinion the same is required."

In so far as the coroner's duties are concerned the acts are declaratory of the common law as it existed in this state. The act of 1935, supra, requiring an investigation where death is sudden or violent or of a suspicious nature enlarges, rather than confines, the coroner's powers. The coroner, of course, must continue to exercise reasonable discretion. Each case coming

before him must necessarily depend to a greater or less extent upon the facts. Death, later determined to be suicide, accidental, or even due to natural causes, as from acute heart attack, by reason of the attending circumstances and violent or sudden nature, may be entirely proper for investigation by the coroner.

All of the plaintiff's investigations were in our opinion made upon sufficient basis to entitle him to recover. Death in each instance was reported to him by a reputable person as occurring under circumstances demanding an inquiry by him.

We do not agree with the appellee's contention that the coroner should have questioned the informers in an effort to determine whether further action on his part was necessary. The coroner, or his deputy, should conduct his own view and investigation and not unlawfully delegate his duties to his informers by accepting their hearsay and opinion evidence.

Our conclusion is that the court below was in error in restricting appellant to recovery of fees to a case where directions to act had been given by the district attorney. The coroner and district attorney are separate officers, and while an investigation ordered by the district attorney may well be proper, the coroner is not required to wait upon instructions from him before making any preliminary investigation.

Judgment is reversed and now entered for the appellant for the full amount of his claim.